Once again, good morning. I'd like to go directly to the judge's decision, the immigration judge's decision of January 5th, 2001. And in her decision, she indicates that but for the credibility issue, she describes this case as being a boilerplate grant of asylum. And it seems to me in looking at all the entire record, what may appear to be something that is reasonable for one person may not be entirely reasonable for someone else. And I find that there are things that my son who's present with me, who's here today in court, he's 16, he can do things that I'm not able to do. And he may be able to run up the stairs to the house and be there in his room even before I get past the front door. In this instance, we have an illiterate rice farmer. And he has about 10 acres. And sometime in June or July, he would flood the land. He would seed the field by hand, not as we do here in this country, whether it's up in northern Sacramento area that we can seed 2,000 acres by air. He would do it by hand. And after a month or so, maybe around 60 days when those seedlings were up maybe about two or three inches and they grow in clusters, he would take them and break them and then plant them by hand. And sometime about four or January, it would be time to harvest. They'd drain the land. And he might be lucky to get about 10,000 pounds of rice from the entire harvest that he would do off of those 10 or 12 acres. The reason I take a moment to describe this is that we have a record that as we read through it, there are portions of it that become inaudible. We have an interpreter that is providing the translation for us. And in that courtroom, what may appear to many of us is to be reasonable as far as being able to get a document from India made to someone who cannot even read or write, but has learned how to write his name. Isn't the biggest problem in this case not the documents you didn't get from India, but the one you did? I think that definitely is a problem here because we have an incident. We're talking about the incident in September of 1997, the first incident as far as the arrest. And we have a passport that's stamped in December of 1996. I have had on the witness stand a consular officer from Central America, one of the Central American countries, that has asked a pardon from the court, if you will, to say, you know, the way our documents are in our home country are so haphazard that some of the documents that appear that individuals have that are fraudulent are better quality than the ones that we issue ourselves. So I don't know how much we can, how much weight, how much we can believe that if he received a passport that has a stamp in December of 1996, but his testimony was after the first arrest, when the militants gave me the bag with the ammunition and so forth, and I hid it in the rice field, after that period, that's when I went to pick up the passport. And this record, as we read through it, we see... So what exactly are you saying? You're saying that it really wasn't issued in 1996 or that he's wrong about his dates or what? I think that before the court, before the... I think that it's possible, it raises a question that the court could have examined right then and there, and that the government attorney could have come forward and said, Your Honor, we'd like to have that document, we'd like to send it to forensics, we'd like to check with the government of India to see if, in fact, they issued this document. Rather, what we have is we simply have the doubt that is infused into the decision by the... You're saying it might have been a fraudulent document? I just need to be... You're being very eloquent, but I'm not getting exactly what your point is. The point is that that document, the authenticity of that document is in question, and no one ever resolved it below. So, in other words, your point is it might not have been a previously issued document, it may have been just a simply fraudulent document. Is that going to help him? That is correct. How's that going to help him? If he has a fraudulent passport as opposed to one that was issued earlier than it could have been? Because the claim is not that he's asking admission based on that passport. That passport is what he's presenting to identify himself, and that, it may... No, but also to date, as I understand it, to confirm a story he's telling about when he decided to leave the United States and therefore went and got the passport, and so on. In other words, it's not simply an identity. In this particular instance, unlike in many instances, the passport is not simply an identification. It is part of his time sequence in terms of when he did whatever he did. And I think that what he presents in that time sequence, he does so right there on the documents that are, whether it's the newspaper article that's missing a portion of the complete article that the judge identifies, or the passport. I think that that doesn't go to the heart of the case. Rather, it's his testimony. And this Court, in a number of cases, particularly in the Sidhu case, recognizes that, yes, if there are questions that are unresolved for the judge, it may be that if it's reasonable, for a reasonable person to obtain corroborating evidence, they should do so. The question, in my mind, is how reasonable is it for us to believe that an illiterate rice farmer who spends about six to seven months going through the whole process of planting and harvesting his rice, and maybe making a total of about $10,000, what would be the equivalent of $10,000 a year, how reasonable is it to believe that that individual can go out and gather more corroborating evidence? Isn't it sufficient that he has testified, as the judge finds at the end of her decision, that this is a boilerplate grant of asylum, but for the questions that she raises. She raises, well, you know, if I ask you what are the five Ks, and you can only remember that you're wearing a bracelet, that's a problem for me. If I see that you have a turban, but your beard is just starting to grow, that's a problem. It appears to me that his claim is set forth, and the claim is, this is what happened to me. I was in the rice fields. There was a bag with ammunition brought to me. I was told to hide it. And it's in September, we know that by that time, that those seedlings are now about two feet high. Okay. Okay. If you want to reserve any time, you can keep going or you can reserve time. I'll save the minute that we have. Thank you. Thank you. Good morning again, Your Honors. Carol Federighi on behalf of the Attorney General. As Your Honors have pointed out, the issue in this case is whether the board, whether the evidence compels a finding that the Petitioner was credible. The only issue that the board ruled on was adverse credibility, not as Petitioner did note that the IJ did find that absent adverse credibility, he might have held for Petitioner on the asylum claim. However, the board did not rule on that issue, so it's not before the Court today. Well, what we look at is whether the reasons that the IJ gave for finding lack of credibility really go to the heart of the case. If they're peripheral, then we say that's not a proper basis. So were these things the wrong date on the passport? And apparently she seemed to think that his story about helping to catch the robbers was somehow incredible. Do those go to the heart of the case? And on the robber thing, it seems to me that she's skating on rather thin ice. In terms of her credibility finding on the issue? Well, I wanted to turn to that first, actually, because that's, I think, one of the major problems he has with his credibility has to do with that second incident, which is one of the two incidents that he claims is evidence of past persecution does go to the heart of his claim. Clearly, when he talks about this arrest or this incident, what he's trying to do is say that what happened to him is what is described in this newspaper article that he's managed to get from India. So the newspaper article is dated September 5th, 1997, and talks about an incident in which two robbers were accosted and stopped by citizens, and it turned out that the robbers were policemen. So he says he was one of those people that apprehended the robbers. So far, so good, but then when it doesn't fit in with the rest of his story, and that's the problem, then it becomes clear that he was not there. He could not have been one of the apprehenders. He said that he was originally arrested, his first arrest was in August of 97, August 14th, actually, and he was held for five days, released August 19th, and then that a month later, he was arrested the second time. He also says that after he was released, he couldn't walk for several days, or he could walk with difficulty with a cane. It's not clear he testified contradictorily on that, but basically he was injured, he had trouble getting around. So it's unlikely that by September 5th, he could have been ambulatory enough to chase after and catch two policemen. How many days were there intervened? Between August 19th and September 5th, there would be 17 days, and he said that he, for some period, which he said at one point was like unlikely, he could have been able to get these robbers. Then he said he was arrested two days after the incident with the robbers, but he had earlier said that he was arrested the second time a month after he was released from the first arrest, so that would have been September 19th, and instead he's saying he was arrested September 7th. So there's a contradiction in the dates there also, and all this arises from him trying to put himself into that newspaper article. And then the other contradiction is that the newspaper article identifies the individuals who were apprehended as police officers, so they're already there publicly identified. It's not clear why they then had to arrest Petitioner after that. Well, it could be the silent blues wanted to get back at somebody who had participated in That's possible, but that's not the explanation he gave. He gave some convoluted explanation about how they were militants disguised as police, and then know they were police disguised as militants. It was really, it was this convoluted explanation, and it didn't fit, again, with the article which had already identified these people as police officers. So this whole robbery incident becomes very suspicious and doubtful, and that by itself provides ample support for the board's adverse credibility finding. And again, the standard is that the evidence has to compel the opposite finding, and in this case, given all these questions that are legitimately raised about this story, you can't say that the evidence compels a finding that Petitioner was credible on this issue as well as, you know, a credibility issue that would go to his entire claim. As for the passport issue, this goes to, again, as Your Honor's pointed out, it goes to his whole story and how the events all fit together, because he said he didn't start seeking a passport and to come to the United States until, alternatively, he says after his first arrest or after a second arrest. So again, that throws doubt on his whole motivation for coming to the U.S. if he'd already sought a passport in 1996, and it, again, throws doubt on the story of the events as he told them. It also, given that he had no other evidence in the record of his identity, this is the only evidence, the documentary evidence, of his identity as a Sikh. And the immigration judge had noted other aspects of his testimony that threw doubt on his identity as a Sikh or as, on his claims involvement with one of the Sikh parties, the Akali Dhan Man Party. And the passport issue relates to that because that goes, he's using that as part of establishing that he's a Sikh. He says... I don't understand. Why does the passport establish him as a Sikh? Well, it shows that he's, his name is Singh and he was born in Punjab, you know, so it goes towards that. He testified that he didn't keep any of the 5Ks, which are required of Sikh adherents, and he couldn't even name all of them. But then when asked, he did admit that he wore a bracelet, which is one of the 5Ks, every day of his life. So it doesn't jive that he would not remember the 5Ks and then claim that he wore one every day of his life. I don't even understand the implication of that. The implication is he put the bracelet on but forgot why? I mean, if he had the bracelet on, then he had the bracelet on. There's no evidence he actually, I don't know if he had it on at the hearing. The evidence is that he didn't wear it. But he did have it on at the hearing, that was the whole point. The IJ said, look, you have a bracelet on. I don't remember that point exactly, but I guess the implication is that he only put it on for the hearing and he forgot why he put it on. And that in any event, his claim that he wore it every day of his life was suspicious given that he couldn't, when asked about the 5Ks, he said he didn't keep any of them. And he also said that he was a member of the Akali Dhan Party, and he said that in his declaration. But then at the hearing, he couldn't identify the name of the party that he joined, it's the Akali Dhan Party. He called it the Smaranjit Man Party, who's the head of that party. But he did not say he was a member of Akali Dhal. And when asked, do you mean the Akali Dhal Party? No, he said that's a different party. So his lack of... I must say that, as Judge Fletcher may have indicated before, I find all these history lessons with regard to fairly unsophisticated people totally... Well, again, I'm not saying that the fact that he didn't know the exact name of the party is dispositive here. It's the fact that he contradicted what he said in his declaration. In his declaration, he said he's a member of the Akali Dhal Man Party. And then at the hearing, he couldn't identify that same party as the party he was a member of. So it's the contradiction between the two documents. And he also said that the police did not know he was a member of the Akali Dhan Man Party, which casts doubt on his claim or his fears of being persecuted in the future on that basis, which is the basis for his claim. They didn't know he was a member of the party. There's no indication that they're going to continue to pursue him for any reason. I mean, even by his own story, the reason he was arrested the second time was he got in the midst of this robbery attempt. And the first time he had agreed to hide ammunition. And there's only because some militants came by and sort of forced him to do so. So there's no indication he would ever have any future run-ins with the police, given that he admits the police don't know who he is. So in sum, Your Honor, this is a straightforward adverse credibility case. Petitioner has numerous contradictions and discrepancies in his testimony regarding, in particular, the second incident involving his robbery, the date on his passport, and various details about his political involvement, which contradict what he said in his declaration. For those reasons, the evidence does not compel a finding that the board should have found him to be credible and the decision should be upheld. Thank you. Your Honors, the page 10 of the judge's decision, about the fourth or fifth line down, indicates the respondent has no formal education. He may be somewhat intimidated and out of his element. I think that in reviewing these cases, we need to not only be able to read the transcript, but then to be able to look at who the folks are that we are reviewing the cases for. And someone who's an illiterate rice farmer very much is out of his element in a court and very much may not be able to understand totally what is required of him and may give the best story that is his story of what has happened to the court. And to the extent that someone may not find that he has a long beard or have all these other items that he should have or that we believe he should have, I don't think it diminishes his claim whatsoever. Thank you. The case of Balwant Singh is submitted. We go on to the case of Sharnal Singh v. Ashcomb. Thank you.
judges: B Fletcher, Leavy, Berzon